WILLIAM E. SCHMIDT *et al.*, Plaintiffs-Appellants, v. THE CITY OF BERWYN *et al.*, Defendants-Appellees.

First District (5th Division)   No. 83—0488

Opinion filed June 14, 1985.

Walter M. Wlodek, of Chicago (Sheldon Klein, of counsel), for appellants.

Russell W. Hartigan, of Chicago, for appellees.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiffs are the owners of two vacant 50-foot by 125-foot parcels of land in Berwyn (hereinafter referred to as the Oak Park Avenue property and the 34th Street property). Both parcels, according to a

1966 Berwyn zoning ordinance, were zoned "A-1, single family residence." Plaintiffs sought to erect a multi-unit apartment building on each parcel of land. They submitted an application for a zoning variance to the Berwyn zoning board of appeals, which granted their request, but the Berwyn city council rejected the board's recommendation and by a unanimous vote denied the variance. Plaintiffs then appealed to the circuit court of Cook County, which affirmed the Berwyn city council's decision. The court reasoned that plaintiffs had purchased the properties subsequent to the 1966 zoning ordinance and were well aware of the residential zoning restriction and that they did not sustain their burden of proof that the ordinance was arbitrary, capricious and unreasonable.

On appeal to this court, plaintiffs contend (1) the single-family residential zoning of their land is arbitrary, unreasonable and void because it imposes a substantial economic loss and does not significantly further public welfare; and (2) the residential zoning is arbitrary and unreasonable when measured by well-established criteria. We affirm.

THE OAK PARK AVENUE PROPERTY

The evidence presented before the trial court concerning this parcel was first the testimony of plaintiff William Schmidt, who stated that prior to his ownership, the land was used for approximately 20 years by a lumber company as a parking lot for its employees. The land is blacktopped, and Schmidt presently rents the lot to the "Department of Army-Navy." Across the street from this lot, on the northeast side, is a 3½-acre empty lot which is zoned for industrial use. At the south end of the block (Oak Park Avenue at 31st Street) on the same side of the street as plaintiffs' property, are two multiunit apartment buildings. Schmidt testified that the Oak Park Avenue block has "a numerous mixture of buildings" with modern and older two-flats. Directly east of the property, on Euclid Avenue, are "two relatively modern two flats that were put in about 15 years ago. From there on you have a combination of older high residential type of buildings." Also, approximately 200 feet east of the property are the Berwyn water works department and an equipment garage. Schmidt said approximately one block south on Oak Park Avenue, the area was zoned " 'general commercial' *** [and] you have a church on the corner and then you have [a] various mixture of funeral home, hotel, large apartment building, tile and paint shop. It is a mixture of commercial." Schmidt agreed that the "primary resiċential district is in the area in which the subject property is located" and that "in effect it is surrounded by either industrial or commercial type proper-

ties."

Testifying further, Schmidt stated that he had decided not to construct a single-family building on the property because 8 inches of stone fill that was beneath 4 inches of blacktop would have to be replaced with dirt and because the building would be "across the road from industrial property which we don't know what will happen to it. ***. A single family residence sure didn't seem to be appealing to any of the people that I showed it to who could have been future buyers ***. They shied away from it right away." Schmidt described Oak Park Avenue as a heavily traveled street, with commercial vehicles and buses. He explained that he "just couldn't build a single family home there and sell it" because the price would be prohibitive. The factors he considered in this regard were clearing the lot, preparing it for construction and returning the property "to a single family residence type of an atmosphere, of lawn and shrubbery and the likes of that. [D]ue to the fact that it was used for a parking lot so long all of the sidewalks have to be replaced. They are totally ruined. And the curbs have to be installed because they knocked the curbs out when they put the curb parking in there." Schmidt stated that next door to his Oak Park lot was a 70- to 80-year-old building and that "down the block there are many aged buildings that still have stone foundation which puts them over 70 years old." He further testified that his proposed building would be "very comparable [in height] to all of the buildings in the block."

Under cross-examination, Schmidt explained that directly across the street, on the west side of Oak Park Avenue, were "mostly" single-family dwellings. Across the alley on Euclid Avenue was another residential street which was "probably pretty close to 50%" single-family residential, "[b]ut the following block [on Euclid Avenue] is heavier to two flats and it is more than 50% of two flats." Schmidt agreed, however, that "a lot of the items mentioned, the two flats behind some of the multiple unit dwellings, preexisted the 1966 ordinance." He also stated that it would be far less expensive to construct a commercial or apartment building "than with a single family who are looking for grassy yard. [I]n order for to put up a single family you have to remove everything. Whereas on [a multi-unit] building like this here I can leave the total back end for parking. I don't have to remove it. I would have to remove approximately half of the debris off the lot and the rest could remain because that would be a parking area." Schmidt also stated that "it is possible that 50%" of the block, from one end north to the other end south, would be single-family residences," but that "[i]t is hard to determine on some of these because

you don't know how many [families] are in there unless you go in. The buildings are so large."

Plaintiffs' expert witness, Howard Stulgin, a real estate appraiser and broker whose office was located in Brookfield, next testified that he viewed the Oak Park Avenue property and observed that "the properties on the west side of Oak Park Avenue from 31st Street to 30th Street *** [are] primarily a mix of 50-plus-year-old and 20 to 25-year-old, single-family residences. The area directly north of the subject property on the east side of Oak Park Avenue is about a three and a third acre, vacant site. It was formerly the location of the Berwyn Lumber Yard. It is now vacant. It is zoned industrial." Stulgin then identified several photographs he had taken of the area surrounding the Oak Park Avenue property which included a picture of the municipal garage and water storage tanks located approximately a half block away, and the vacant industrial lot northeast of the property. Stulgin said approximately 45% of the property located in the block where the Oak Park Avenue property is located is multi-family and 55% was single-family residential. The block behind this area between 31st and 30th Streets has two five-flat apartment buildings that are 15 to 17 years old, "one vacant site and the remainder are older two-flats."

Stulgin explained further that this area has three or four "50-year-old Bohemiam-style (octagon-type with a sunroom in front] bungalows and the others are maybe 20-year-old bungalows." The majority of the properties in this block are over 20 years old. Stulgin made an analysis of the Oak Park property as to its highest and best use. In making this analysis, he testified that he considered the size, shape and location of the lot, its proximity to a large, industrial vacant site, the traffic flow on Oak Park Avenue and on 30th Street and the other property within a block or block and a half in each direction as well as the requirements of the zoning ordinance and the building codes. He also stated that he considered the socio-economic factors to build "a marketable house on this lot that would meet the demand of the public." The land and building would have to be sold "as a package" at a price of $75,000 to $80,000. An additional construction expense to prepare the land as a single-family residence would be the removal of the ground below the asphalt paving "in order to have fill put in or to put in a lawn." Stulgin stated that some of the fill would still have to be removed to put in a lawn for a multi-unit building but the rest could be left for a parking area in the rear. He said the total price would not "meet the demand of the public" and the lot would therefore have to be sold at a lesser price, "possibly at a loss to the devel-

oper or contractor."

A multi-unit building would not have an adverse effect on the traffic flow, Stulgin testified, because the traffic entering the building's parking lot would not have to travel past any other homes and because Oak Park Avenue is a major street in the area. In Stulgin's opinion, the highest and best use of the Oak Park Avenue property would be a "multi-family development to a possible five-unit apartment building." The site as a single-family residence "would have a value probably within a range to fifteen thousand [dollars]." In appraising the value of the land, Stulgin further testified that he "made a search of the area" but could not find any sales of "vacant land which were used for development of single-family residences."

Cross-examination of Stulgin revealed that his photographs of the Oak Park Avenue area which plaintiffs introduced into evidence did not include photos toward the south end of the block, which would show that all the dwellings on Oak Park Avenue were single-family residences. Stulgin also stated that a multiple dwelling was "anything more than one unit." A structure could appear to be a house but, he explained, there would be "more than one [living] unit." Stulgin used this definition of a multiple dwelling to determine what percentage of homes in the area was single and which was multiple family.

Witnesses testified for defendants in opposition to a multi-unit building on the Oak Park Avenue property. Their testimony revealed that the house next to the property was not a single-family home but, according to Joann Smith, whose parents live in that house, "the whole area is filled with small type homes." Jeanie Ljungburg testified that she moved to south Berwyn because of a majority of single-family, "lovely, older homes" in the area. Ljungburg also testified that the alley behind the Oak Park Avenue property was "not that wide" and that in order to park, cars "would back up directly into our fence and into our garage." It was revealed on cross-examination, however, that Ljungburg's home had a separate bathroom, kitchen, sleeping quarters and means of egress. At one time her home was used as a four-family dwelling.

Next, Eileen Ping, who lived at 3031 South Oak Park Avenue, testified that she also disapproved of the proposed zoning for the Oak Park Avenue property because when she purchased her home "it was with the intention of getting in a residential area ***." She also objected to a multi-unit building because it might aggravate the sewage system which occasionally backs up into her basement.

Arthur Rosecky, an appraiser, testified that he inspected the Oak Park Avenue property and that if a multi-unit building were erected,

the depreciation of the surrounding buildings and land would be 10 to 20 percent. There was further testimony concerning a density factor and privacy problem.

Next to testify for defendants was Professor Pierre DeVise of Roosevelt University in Chicago. His area of specialty was urban planning, urban ecology, urban economics and urban politics. DeVise inspected the 1966 Berwyn comprehensive zoning ordinance as well as the two lots in question in this case. He stated that he drove and walked around the block between 30th and 31st Streets, and he examined maps which indicated "the characteristics of the structures, the number of stories, single family, dual family [and the] make of construction." Based on his observations, 25 out of 30 or "somewhere above three-fourths" of the block were single-family units.

THE 34TH STREET PROPERTY

This property is a vacant 50- x 125-foot lot sandwiched between two large houses approximately 60 years old. Schmidt testified that based on his knowledge of the Berwyn zoning code, he would be "limited" to constructing one building on this lot. Although the lot has grass and trees, there have been no improvements, and the only structure on the lot is "an old garage which could be removed." On the east side of the lot is a two-family, two-story home with an attic and a peak roof. To the west is a three-family dwelling which, Schmidt stated, has "another apartment that has been added to the upstairs in the last couple of years. They call it a family apartment but it is an apartment." Schmidt had previously owned this building. Approximately 150 feet from Schmidt's vacant lot is a commercial bank. Schmidt said the area around the bank was "all commercial," with a medical center, parking lot and a hospital being built. "It gives you an idea that it is a very heavily traveled area and highly commercial and the cars will tell you there is never a place to park."

Under cross-examination, Schmidt testified that the area across the alley of the 34th Street lot was zoned as an apartment district, which zoning allows multi-unit dwellings. Two streets north, on Kenilworth Avenue, are two six-unit condominium buildings, a 36-unit apartment building and "scattered multiple dwellings." Schmidt further explained that north of the "apartment district" there is a general commercial district and that farther north at the end of that block are more commercial buildings with apartments located above stores. Schmidt agreed that "the only area in this particular section which is considered [A-1 single-family] happens to be the block on which [the 34th Street] property is located.

Schmidt further testified that he had been a builder since 1954 and that to his knowledge there was no comprehensive zoning ordinance in the Berwyn area prior to 1966. He concluded that like the Oak Park Avenue property, it would be uneconomical to construct a single-family structure on the 34th Street lot for a number of reasons, namely because it would be "among old buildings and highly traveled roads and the likes of that" and because it would be 15 feet high but "inbetween two houses which are 40 feet high."

Schmidt stated that the property directly across the street from the 34th Street lot was single-family residential. He again explained that he could not build a single-family, 15-foot-high ranch house dwelling on his property because "it is such a highly commercial area *** with the bank and the new hospital and then the new medical center. ***. They are renovating a theatre down the street and making 14 doctors' office[s] ***. It has gotten to the point that it has no desire for single family residence. It is strictly commercial."

Schmidt also testified that his proposed building would not increase the already heavy amount of traffic on 34th Street because he would provide parking stalls for the tenants off the street. There has never been anything on the property except for a garage that was built by "the people that owned the corner house." Schmidt said that he owns the house on the corner, that two families live there and that it is rented.

Howard Stulgin, the real estate appraiser who had previously testified as plaintiffs' expert witness about the Oak Park Avenue property, testified further for plaintiffs that none of the buildings in the 34th Street block between Grove Avenue on the east and Kenilworth Avenue on the west were single-family residences. The area parallel to 34th Street along an alley behind the 34th Street property was zoned as an apartment district. Stulgin testified that there were "several" older (50 to 70 years), two-flat buildings in this area and a "brand new" six-flat condominium. Also, one block east of the property on Oak Park Avenue, a hospital wing was under construction.

Stulgin testified that a three- or four-story medical building was located on 34th Street and Oak Park Avenue. He stated that 34th Street "is a commercial thoroughfare" which permits truck traffic. Grove Avenue "is also a heavily traveled street because of the parking area *** for the medical building and for the bank and for the hospital." Kenilworth Avenue "is a mix of older apartments, two-flats," and a 16-unit building. Stulgin stated that only one single-family residence could be built on the 34th Street property, at a minimum construction cost of $55,000. As presently zoned, the value of the prop-

erty, according to Stulgin, would be between $12,000 and $15,000. The value of the property with a multi-unit building would be between $20,000 to $25,000. In Stulgin's opinion, there would not be any detrimental effects to the area in constructing a four-flat or four-family-unit apartment building. There would be sufficient area for five parking spaces in the back of the site. He added, "with the improvements that are located on either side of the subject property, a one-story, single-family resident [*sic*] would stand out like a sore thumb" and that four units would not make any drastic change in the traffic because of the "large traffic flow that is there now. It would be a drop in the bucket." The highest and best use of the property, according to Stulgin, would be a four-flat apartment building.

Under cross-examination, Stulgin testified that he only knew from hearsay that the residences on 34th Avenue two blocks west of the property in question were multifamily. He agreed that his map of the area which plaintiffs introduced into evidence was not color-shaded to show that the block next to the 34th Street property "all the way through up to Harlem Avenue" consisted of single-family residences. Stulgin further acknowledged that the homes indicated as "old, two-flat" on a map he had drawn for plaintiffs were "probably not" constructed as two-flats, but "were probably redeveloped after a certain age and made into two-flat apartment buildings."

When asked a hypothetical question as to the highest and best use of the 34th Street and Oak Park Avenue properties considering the fact that the population of Berwyn had decreased by 10,000 people within the last 10 years, Stulgin stated that it would not have an effect "because we are talking about a *** new building and I think that new construction would have sufficient draw to be able to rent four or five units that would be developed."

Plaintiffs next called attorney Milton F. Persin, secretary to the seven-member zoning board of appeals of Berwyn. Persin explained that the Illinois Revised Statutes set forth standards to allow a zoning change or variation. The 1966 Berwyn zoning ordinance supplements those standards with additional factors such as the effect of the variation on property value and "generally any other items pertaining to the general safety, health and welfare of its citizens." Persin stated that he was unaware of a zoning code which existed prior to 1966. Persin's subsequent testimony concerned the zoning board's public hearings, its decision to grant plaintiffs a zoning variance and the presence of multiple- and single-family residences as well as apartment buildings and commercial areas near the Oak Park Avenue and 34th Street properties. Persin testified that an area near the Oak

Park Avenue property was "intermixed" when the 1966 zoning code was passed.

Persin testified under cross-examination that the area located approximately four blocks west of the Oak Park Avenue and 34th Street properties were "predominantly" single-family residential but that there were numerous nonconforming usages and "illegal conversions" as well. He agreed that "as an estimate," 90 percent of the zoning board's recommendations were approved by the Berwyn city council. Redirect examination disclosed, however, that many of the petitions that come to the board were for fences, garages and nonconforming lot lines and were not necessarily for rezoning to multifamily dwellings. Persin further testified that 34th Street and Oak Park Avenue were "heavily traveled" streets. Plaintiffs then rested their case.

Next, witnesses testified for defendants in disapproval of a multiunit building on the 34th Street property. Terry McManmon, president of the Berwyn Historical Society, testified that a consensus of the 50-member Society had decided to study the history of the two homes that are on either side of the lot. Loretta Shepelak, a 30-year resident of Berwyn and president of the West Suburban Propertyowners Association, testified that she objected to a multifamily building on either the 34th Street or Oak Park Avenue property because it was a single-family residence zoning area and would burden the sewer system, utilities and parking area. William J. Kareiva, who lived in a single-family residence at 6901 West 34th Street for 11 years, objected to a multi-unit dwelling because he had "bought into a single-family area" and did not "want anybody building any apartment buildings around me." In 1979, Kareiva wrote a letter to the Zoning Board in opposition to plaintiffs' proposed zoning for the 34th Street property. Kareiva next identified two areas on plaintiffs' exhibit which in his opinion were wrongly identified as "old two flat" residences. He said that both were single-family dwellings and that one room on the second floor of only one of the homes had been rented out. Kareiva characterized the parking on 34th Street as horrible and congested.

Arthur Rosecky, an appraiser, also testified for defendants that he inspected the 34th Street property and that a multi-unit dwelling would adversely affect the value of the adjoining two properties and would create density and privacy problems. Steve Kolak testified that he lived at 6839 West 34th Street, two buildings east of the 34th Street property, and that his building was a single-family dwelling. Kolak identified his building on one of plaintiffs' exhibits and agreed that plaintiffs' characterization of the property as "an old two flat" was incorrect. Kolak testified further that he disapproved of a multi-

unit building on the 34th Street property.

Professor Pierre DeVise, who had previously testified about the Oak Park Avenue property, was the last witness called by defendants. DeVise disagreed with plaintiffs' classification of buildings and stated that "everywhere it [plaintiffs' map] says old two flat, I would suggest that this would be an old single family residence based *** on the records from the City of Berwyn." DeVise further stated that the property adjacent to both lots in question "is predominantly single family zoning. The useage [sic] is also predominantly single family zoning ***. But also within the two flat and the multi-unit designations the predominance of the actual uses in those multi-family designations are in single family residences." DeVise testified that in 1980, according to the 1980 census of housing, 46% of the housing units in Berwyn was single-family and 54% was multifamily. For both lots in question, he said, a single-family residence would be better suited to the neighborhood "where there is a predominance of older single family residences, pre-war residences. *** I believe that the highest and best use of the two subject properties would be in conformance with the present single family zoning. [My opinion] is predicated upon the present character of the neighborhood which is single family pre-war housing for which there is a better demand, a better market demand at this time than for post-war multifamily housing."

DeVise testified under cross-examination about the maps and zoning areas surrounding the two lots in question. He stated under redirect examination that "looking at the vacancy rates for the two types of housing and looking also at the single family useage [sic] of multifamily zoning would suggest to me that there is a greater market demand for single family housing than for multifamily housing. Also looking at the changes over the years and average rents and average home values, *** average rents in real dollars have declined, whereas average home value has increased in Berwyn. The vacancy rate was about eight times higher for multifamily housing than for single family housing."

At the close of the evidence, the trial court ruled in favor of defendants. The court stated that it considered the "relative gain to the public as compared to the hardship imposed upon the property," that the property had been vacant for many years, and that when plaintiffs purchased the property they were "well aware" of the existing residential zoning. The court went on to state, "The difficulty *** is whether or not the court should interfere with this long existing plan." The court found that it should not interfere with the zoning plan and ruled that plaintiffs had failed to sustain their burden of

proof that the ordinance was arbitrary, capricious and unreasonable.

■■ A zoning ordinance is presumed valid. When contested, the plaintiff must establish by clear and convincing evidence that the ordinance, as applied to the property in question, is arbitrary, unreasonable and without substantial relation to public health, safety, comfort, morals or general welfare. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 111, 324 N.E.2d 406; *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46, 145 N.E.2d 65.) The general factors considered in arriving at this determination include (1) the existing uses of zoning of nearby properties; (2) the extent to which the existing zoning diminishes the property's value, and the proposed zoning enhances it; (3) the relative gain to the public as compared to the hardship imposed upon the individual property owner by the existing and the proposed zoning uses; (4) the suitability of the subject property for the zoned purposes; and (5) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 111-12; 12 Ill. 2d 40, 46-47.) Where the most that can be said is that the reasonableness of the ordinance is fairly debatable, the decision of the municipal authorities must be upheld, and the trial court is not justified in substituting its judgment for that of the municipal authorities. (*Cosmopolitan National Bank v. City of Chicago* (1961), 22 Ill. 2d 367, 372-73, 176 N.E.2d 795.) In cases of this type, it is natural for differences of opinion to exist, but it is for the court to determine whether those differences are reasonable and justifiable. No single factor is controlling, and each case must be judged on its own facts and circumstances. (*La Salle National Bank v. Village of Harwood Heights* (1971), 2 Ill. App. 3d 1040, 1046, 278 N.E.2d 114.) It is upon these principles that plaintiffs' case challenging the denial of their request for a zoning variance must be evaluated.

The record shows that the zoning of nearby properties for the Oak Park Avenue and 34th Street lots include areas that are zoned A-1 residential (single-family) and B-3 apartment. A large vacant lot is directly across the street from the Oak Park Avenue property, and a municipal garage with water tanks is at the eastern corner. Directly across the street to the west on Oak Park Avenue, however, and next door to the east there are "old," single-family homes. The 34th Street lot is between two large, single-family homes, but behind that lot, across the alley, the area is zoned as a B-3 apartment district. It appears to us, and the evidence establishes, that the majority of buildings surrounding the two properties are single-family residences. For

example, Howard Stulgin testified under cross-examination that as to the 34th Street property, the units on 34th Street, going north toward Harlem Avenue, were single-family residences. Additionally, our review of the trial testimony and exhibits reveal that there is a dominating influence of single-family homes across the street, behind and next to the Oak Park Avenue property as well. Even though there is a large, vacant lot across the street from that property, that does not conclusively prove that the single-family zoning ordinance in question here is unreasonable as applied to plaintiffs' property. *Cosmopolitan National Bank v. City of Chicago* (1961), 22 Ill. 2d 367, 373, 176 N.E.2d 795.

■ We further note that the fact that the properties in question may be more valuable if zoned for multi-unit use is not decisive on the question of whether the current zoning ordinance is valid. (*People ex rel. Alco Deree Co. v. City of Chicago* (1954), 2 Ill. 2d 350, 358, 118 N.E.2d 20.) We also note that defendants' argument that the relative gain to the public would be negligible if a multi-unit building were constructed on the lots was supported by the testimony of defendants' expert, Pierre DeVise, who stated that property values in the area would decrease 10 to 15%, and the testimony of several residents who expressed disapproval of plaintiffs' proposed buildings because of the adverse effect the buildings would have on the market value of their homes. DeVise also testified that the character of the existing neighborhood near plaintiffs' lots would change if a multi-unit structure were built.

Thus, the relative gain to the public by denying plaintiffs' request for a zoning variance in our opinion outweighs the hardship imposed on plaintiffs to conform to the current zoning requirements. For these reasons, plaintiffs' proposed buildings are not suitable for the zoning scheme of single-family dwellings. Plaintiffs were aware of the existing residential zoning when they acquired the lots, and no competent evidence was presented to show that the land is totally unsuited for a residential dwelling other than plaintiffs' testimony that it would be financially burdensome to construct that type of structure.

■ We conclude that plaintiffs have not sustained their burden of proof by clear and convincing evidence that the Berwyn Zoning Ordinance is invalid. Although the evidence did establish that there was a difference of opinion between the experts as to the highest and best use of the two lots, this discrepancy is not decisive. The trial court's rationale is instructive here:

"Although the evidence is in dispute, it is apparent to the court that prior to the 1966 zoning map being adopted, single-

family homes were converted to two and three flat residences, and continue to this date to be used as legal non-conforming two and three flat residences. And these two and three flat residences are within the immediate area or in close proximity to the 34th Street site.

Mr. Schmidt purchased these properties subsequent to the 1966 zoning ordinance of the Village of Berwyn. He was well aware that the residential zoning has been imposed on these properties by the Village of Berwyn.

In short, gentlemen, *** this case represents the difficult situation of an aging residential area which has been zoned since 1966 as a single-family residential area, but has imposed or existing through it are multi, two and three flat residences that were and are to this date non-conforming uses.

The difficulty as I see it is whether or not the court should interfere with this long existing plan.

In the court's opinion, the plaintiff has not sustained his burden of proof of showing that the ordinance in question was arbitrary, capricious, and unreasonable. I must find the issues in favor of the defendant and against the plaintiff."

We agree with the trial court's decision. Its judgment will therefore be affirmed.

Affirmed.

LORENZ and SULLIVAN, JJ., concur.